UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE YASMIN AND YAZ (DROSPIRENONE) MARKETING, SALES PRACTICES AND RELEVANT PRODUCTS LIABILITY LITIGATION | : : : : : | 3:09-MD-02100-DRH-PMF<br><br>MDL No. 2100 |
| ------------------------------------------------------- | : : | Judge David R. Herndon |
| KATHI ROBBIE AND MICHAEL ROBBIE, | : : | COMPLAINT AND JURY DEMAND |
| Plaintiff | : : | Civil Action No. 3:12-cv-10513-DRH-PMF |
| vs. | : : : | |
| BAYER PHARMA AG, BAYER HEALTHCARE PHARMACEUTICALS INC., BARR LABORATORIES, INC., and TEVA PHARMACEUTICALS USA, INC. | : : : : : : | |
| Defendants | : | |

## COMPLAINT

Plaintiff Kathi Robbie and Michael Robbie of Saratoga County, New York, by and through her counsel, and for their Complaint against Defendants, alleges as follows:

### PARTIES AND JURISDICTION

1. This is an action brought by Plaintiff Kathi Robbie and Michael Robbie (hereinafter "Plaintiff").

2. Plaintiff was prescribed, purchased and ingested Yaz and Ocella, and while using Yaz and Ocella suffered personal injuries.

3. Plaintiff is a resident and citizen of Ballston Spa, New York located in Saratoga County.

4. Plaintiff alleges an amount in controversy in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

5. Defendant Bayer Pharma AG manufactures drospirenone and ethinyl estradiol, the progestin and estrogen contained in Yaz, Yasmin, and Ocella.

6. Defendant Bayer HealthCare Pharmaceuticals Inc. markets Yaz and Yasmin in the United States.

7. Defendant Teva Pharmaceuticals USA manufactures Ocella, the generic version of Yasmin, in the United States.

8. Defendant Barr Laboratories Inc. markets and distributes Ocella, the generic version of Yasmin, in the United States.

9. At relevant times, Defendants were engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the prescription drug Yaz. At relevant times, Defendants conducted regular and sustained business in New York by selling and distributing its products in New York and engaged in substantial commerce and business activity in Saratoga County.

10. Defendant Bayer Pharma AG admits that it was formerly known as Schering AG and is the same corporate entity as Schering AG, with the principal place of business at Mullerstrasse 178, D-13353 Berlin, Germany.

11. Bayer Healthcare Pharmaceuticals, Inc. formerly known as Berlex, Inc., which formerly was known as Berlex Laboratories, Inc., is the same corporate entity as Berlex, Inc. and Berlex Laboratories, Inc., Bayer Corporation, Bayer HealthCare LLC, Bayer Pharmaceuticals Corporation, Bayer AG, Bayer HealthCare AG, Bayer Gesellschaft fur Beteiligungen mbH, and

Bayer HealthCare Pharmaceuticals LLC. Its principal place of business is in Morristown, New Jersey.

12.     Teva Pharmaceuticals USA ("Teva USA") is a corporation organized and existing under the laws of the State of Delaware, with its principle place of business at 1090 Horsham Road, North Wales, PA. Upon information and believe, Teva USA is a wholly-owned subsidiary of Teva Ltd. and is controlled and dominated by Teva Ltd. Upon information and belief, Teva USA, manufactures, markets and sells Ocella for sale and use throughout the United States, including New York, at the direction, under the control, and for the direct benefit of Teva Ltd.

13.     Barr Laboratories, Inc. is a corporation organized and existing under the laws of the State of Delaware, having its principle place of business at 400 Chestnut Ridge Road, Woodcliff Lake, NJ 07677.

14.     At all relevant times, Defendants conducted regular and sustained business in New York by selling and distributing its products in New York and engaged in substantial commerce and business activity.

15.     Defendants Bayer Pharma AG and Bayer HealthCare Pharmaceuticals Inc., Barr Laboratories Inc., and Teva Pharmaceuticals USA are collectively referred to herein as "Bayer" or "Defendants."

16.     This court has jurisdiction over this action pursuant to 28 U.S.C. §1332 as there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

## FACTUAL BACKGROUND
### Nature of the Case

17. Plaintiff brings this case against Defendants for damages associated with Plaintiff's ingestion of the pharmaceutical drugs Yaz and Ocella (ethinyl estradiol and drospirenone), oral contraceptives designed, manufactured, marketed, and distributed by Defendants.

18. Specifically, as a direct result of her use of Yaz and Ocella, Plaintiff developed and was diagnosed and treated for pulmonary embolism.

19. Bayer's Combined Oral Contraceptives - Yaz and Yasmin are birth control pills manufactured and marketed by Defendants. They are combination oral contraceptives, or "COCs," meaning that they contain an estrogen component and a progestin component. Together, these steroidal components work together in COCs to suppress ovulation, fertilization, and implantation and thus prevent pregnancy.

20. Yaz and Yasmin were approved by the Food and Drug Administration ("FDA")for marketing in 2006 and 2001, respectively. Yaz and Yasmin contain a "Fourth Generation" progestin. And although they were approved for sale in the United States, the FDA has been investigating several reports of the high risk of blood clots, gall bladder failure, and other serious injuries associated with these drugs.

21. The estrogen component in Yaz and Yasmin is known generically as ethinyl estradiol. The progestin component is known as drospirenone. Yaz contains 0.03 milligrams of ethinyl estradiol, and Yasmin contains 0.02 milligrams of ethinyl estradiol. Both products contain 3 milligrams of drospirenone.

22. Yaz and Yasmin are different from other combined hormonal birth control pills in that they contain drospirenone.

23. Drospirenone is a progestin that is unlike others available in the United States and was never before marketed in the United States prior to its use in Yaz.

24. As early as the 1960's it has been widely known that the use of birth control pills created a risk of blood clots, heart attacks, strokes and other injuries. With this in mind, birth control pills have been formulated to with reduced amounts of estrogen. As the amounts of estrogen levels reduced, so too did the risk of blood clots, heart attacks, strokes, and other injuries.

25. During this time, new progestins were being developed, which became known as "second generation" progestins (e.g. lovenorgestrel). These second generation progestins, when combined with the lower amounts of the estrogen, ethinyl estradiol, helped to reduce the risk of blood clots, heart attacks, strokes, and other injuries and were considered safer for women.

## OVER- PROMOTION OF YAZ AND YASMIN

26. During the 1990's, new "third generation" progestins were developed. Unfortunately, these "third generation" progestins (e.g. gestodene and desogestrel) have been associated with a greater risk of blood clots in the deep veins (deep vein thrombosis or "DVT") and lungs (pulmonary embolism or "PE") as well as other injuries. As a result of this increased risk of blood clots, the FDA has required that products containing third generation progestins include a warning of the potentially increased risk of thrombosis. Yaz and Yasmin contain the same estrogen component, ethinyl estradiol that has been used in the lower dose birth control pills for decades.

27. However, drospirenone is a new type of progestin and is considered a "fourth generation" progestin. No other birth control pills contain drospirenone, except for a recently approved generic version of Yaz and Yasmin marketed under the trade name Ocella.

28. Since drospirenone is new, there is insufficient data available to support its safe use, particularly compared with second generation progestins. In fact, studies performed prior to FDA approval indicate that drospirenone has certain effects that are different from those of traditional second generation progestins, and potentially more dangerous.

29. One possible mechanism of action is that drospirenone causes an increase in potassium levels in the blood, which can lead to a condition known as hyperkalemia if the potassium levels become too high. Hyperkalemia can cause heart rhythm disturbances, such as extrasystolies, pauses, or bradycardia. If left untreated, hyperkalemia can be fatal. If hyperkalemia disrupts the normal heart rhythms, the flow of blood through the heart can be slowed to the point that it permits blood clots to form. Blood clots in the heart can then lead to heart attacks, or the clots can break off and travel to the lungs where they can cause pulmonary embolism, or can travel to the brain causing stroke.

30. During the brief time that Yaz and Yasmin have been sold in the United States, hundreds of reports of injury and death have been submitted to the FDA in association with Defendants' products.

31. In April 2002, the British Medical Journal reported that the Dutch College of General Practitioners recommended that older second generation birth control pills be prescribed in lieu of Yasmin as a result of 40 cases of venous thrombosis among women taking Yasmin.

32. In February 2003, a paper entitled *Thromboembolism Associated With the New Contraceptive Yasmin* was published in the British Medical Journal detailing a Netherlands Pharmacovigilance Centre report of five additional reports of thromboembolism where Yasmin was suspected as the cause, including two deaths.

33. In fact, in less than a five-year period, from the first quarter of 2004 through the third quarter of 2008, over 50 reports of death among users of Yaz and Yasmin have been filed with the FDA.

34. These reports include deaths associated with cardiac arrhythmia, cardiac arrest, intracardiac thrombus, pulmonary embolism, and stroke in women in their child bearing years.

35. Some deaths reported occurred in women as young as 17 years old.

36. Significantly, reports of elevated potassium levels are frequently included among the symptoms of those suffering death while using Yaz or Yasmin.

37. Defendants market Yaz and Yasmin as providing the same efficacy as other birth control pills in preventing pregnancy, but with additional benefits.

38. However, because Yaz and Yasmin contain the fourth generation progestin drospirenone, they present additional health risks not associated with other birth control pills.

39. For example, prior to its sale to Defendant Bayer in 2006, Defendant Berlex Laboratories promoted Yasmin's fourth generation progestin, drospirenone, by stating, "Ask about Yasmin, and the difference a little chemistry can make."

40. In response, on July 10, 2003, the FDA objected to the characterization that drospirenone was a benefit compared to the progestin used in other combined oral contraceptives, and issued a warning letter stating, "FDA is not aware of substantial evidence of substantial clinical experience demonstrating that Yasmin is superior to other COCs or that the drospirenone in Yasmin is clinically beneficial. On the contrary, FDA is aware of the added clinical risks associated with drospirenone [.]"

41. The FDA's warning letter continued by stating that the advertisement failed "to communicate that the potential to increase potassium is a risk" or that "increased serum

potassium can be dangerous."

42. More recently, Defendants advertised that its product Yaz was indicated for treatment of premenstrual syndrome or "PMS," as opposed to the less serious condition of premenstrual dysphoric disorder or "PMDD."

43. Defendants also advertised that Yaz contained the added benefit of preventing or reducing acne.

44. In response, on October 3, 2008, the FDA issued another warning letter to Defendant Bayer for the misleading advertisement, reiterating that the marketing was misleading because it promoted Yaz for medical conditions beyond the limits of the FDA approval, and adding that "Yaz has additional risks because it contains the progestin, drospirenone ... which can lead to hyperkalemia in high risk patients, which may result in potentially serious heart and health problems."

45. The FDA further warned in its October 3, 2008 letter that Yaz "does not result in completely clear skin" and that Defendants' "TV Ads misleadingly overstate the efficacy of the drug."

46. Indeed, the FDA felt Defendants' over-promotion was so severe that it required Bayer to run new TV advertisements to correct the previous misleading Yaz advertisements regarding acne and premenstrual syndrome.

47. Bayer ultimately agreed to spend at least $20 million on corrective TV advertisements and to submit all Yaz advertisements to the FDA for advanced screening for the next six years.

### PLAINTIFF'S USE OF YAZ AND OCELLA AND RESULTING INJURIES

48. As a result of Defendants' claims regarding the effectiveness and safety of Yaz and Ocella, Plaintiff's medical provider prescribed and Plaintiff began using Yaz on or about December 2007. Plaintiff began using Ocella on or about July 2008.

49. As a direct and proximate result of using Yaz and Ocella, Plaintiff suffered the injuries described above.

50. Prior to Plaintiff's use of Yaz and Ocella, Defendants knew or should have known that use of Yaz and Ocella created a higher risk of injury than other oral contraceptives on the market, including but not limited to second generation oral contraceptives, and that, when taken as directed, such use was unreasonably dangerous to consumers.

51. Therefore, at the time Plaintiff used Yaz and Ocella, Defendants knew or should have known that the use of Yaz and Ocella created an increased risk to consumers of serious personal injury, deep vein thrombosis, pulmonary embolism, heart attacks, stroke, and even death.

52. Despite the fact that Defendants knew or should have known of the serious health risks associated with the use of Yaz and Ocella, Defendants failed to warn Plaintiff and/or her health care providers of these risks before she used the product.

53. Had Plaintiff and/or her heath care providers known the risks and dangers associated with Yaz and Ocella, she would not have used the drug and would not have developed pulmonary embolism.

54. As a direct and proximate result of her use of Yaz and Ocella, Plaintiff suffered physical injury, including but not limited to, conscious pain and suffering and pulmonary embolism.

55.     As a direct and proximate result of Plaintiff's use of Yaz and Ocella, Plaintiff has suffered and will continue to suffer pecuniary losses.

## FIRST CAUSE OF ACTION
### Strict Products Liability Defective Manufacturing

56.     Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

57.     Defendants are the manufacturers, designers, distributors, sellers, or suppliers of Yaz and Ocella.

58.     The Yaz and Ocella birth control pills manufactured, designed, sold, distributed, supplied and/or placed in the stream of commerce by Defendants were expected to and did reach the plaintiff without any alterations or changes.

59.     The Yaz and Ocella birth control pills manufactured, designed, sold, distributed, supplied and/or placed in the stream of commerce by Defendants, were defective in their manufacture and construction when they left the hands of Defendants in that they deviated from product specification such that they were unreasonably dangerous to an ordinary user or consumer and posed a serious risk of injury and death.

60.     As a direct and proximate result of Plaintiff's use of Yaz and Ocella as manufactured, designed, sold, supplied and introduced into the stream of commerce by Defendants, Plaintiff suffered personal injuries and non-economic damages.

61.     Defendants' actions and omissions as identified in this Complaint show that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiff's rights, so as to warrant the imposition of punitive damages.

## SECOND CAUSE OF ACTION
### Strict Products Liability Design Defect

62. Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

63. Defendants are the manufacturers, designers, distributors, sellers, or suppliers of Yaz and Ocella.

64. The Yaz and Ocella birth control pills manufactured, designed, sold, distributed, supplied and/or placed in the stream of commerce by Defendants were expected to and did reach the plaintiff without any alterations or changes.

65. The Yaz and Ocella birth control pills manufactured and supplied by Defendants were defective in design or formulation in that, when left the hands of the Defendants, the foreseeable risks of the product exceeded the benefits associated with its design or formulation, or they were more dangerous than an ordinary consumer would expect.

66. The foreseeable risks associated with the design or formulation of the Yaz and Ocella birth control pills, include, but are not limited to, the fact that the design or formulation of Yaz and Ocella is more dangerous than a reasonably prudent consumer would expect when used in an intended or reasonably foreseeable manner.

67. As a direct and proximate result of Plaintiff's use of Yaz and Ocella as manufactured, designed, sold, supplied and introduced into the stream of commerce by Defendants, Plaintiff suffered personal injuries, economic and non-economic damages, including pain and suffering.

68. Defendants' actions and omissions as identified in this Complaint show that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiff's rights, so as to warrant the imposition of punitive damages.

## THIRD CAUSE OF ACTION
### Strict Products Liability Defect Due to Inadequate Warning

69. Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

70. The Yaz and Ocella birth control pills manufactured and supplied by Defendants were defective due to inadequate warning or instruction and was unreasonably dangerous to the ordinary user or consumer because Defendants knew or should have known that the product created significant risks of serious bodily harm and death to consumers and they failed to adequately warn consumers and/or their health care providers of such risks.

71. The Yaz and Ocella birth control pills manufactured and supplied by Defendants were defective due to inadequate post-marketing warnings or instructions and were unreasonably dangerous to the ordinary user or consumer because, after Defendants knew or should have known of the risk of serious bodily harm and death from the use of Yaz and Ocella, Defendants failed to provide adequate warnings to consumers and/or their health care providers of the product, knowing the product could cause serious injury and death.

72. As a direct and proximate result of Plaintiff's use of Yaz and Ocella as manufactured, designed, sold, supplied and introduced into the stream of commerce by Defendants, Plaintiff suffered personal injuries, economic and non-economic damages.

73. Defendants' actions and omissions as identified in this Complaint show that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiff's rights, so as to warrant the imposition of punitive damages.

## FOURTH CAUSE OF ACTION
### Negligence

74. Plaintiff incorporates by reference, as if fully set forth herein, each and every

allegation set forth in the preceding paragraphs and further allege as follows.

75.     Defendants had a duty to exercise reasonable care in the design, manufacture, sale and/or distribution of Yaz and Ocella into the stream of commerce, including a duty to assure that its product did not pose a significantly increased risk of bodily harm and adverse events.

76.     Defendants failed to exercise ordinary care in the design, formulation, manufacture, sale, testing, quality assurance, quality control, labeling, marketing, promotions and distribution of Yaz and Ocella into interstate commerce in that Defendants knew or should have known that the product caused such significant bodily harm or death and was not safe for use by consumers.

77.     Defendants also failed to exercise ordinary care in the labeling of Yaz and Ocella and failed to issue to consumers and/or their health care providers' adequate warnings of the risk of serious bodily injury or death due to the use of Yaz and Ocella.

78.     Despite the fact that Defendants knew or should have known that Yaz and Ocella posed a serious risk of bodily harm to consumers, Defendants continued to manufacture and market Yaz and Ocella for use by consumers.

79.     Defendants knew or should have known that consumers, including Plaintiff, would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

80.     As a direct and proximate result of Defendants' negligence, Plaintiff Kathi Robbie and Michael Robbie suffered personal injuries, economic and non-economic damages.

81.     Defendants' conduct as described above, including but not limited to its failure to adequately test Yaz and Ocella, to provide adequate warnings, and its continued manufacture, sale and marketing of the product when it knew or should have known of the serious health risks

it created, evidences malicious actions, aggravated or egregious fraud, and/or intentional disregard of the rights of Plaintiff, so as to warrant the imposition of punitive damages.

### FIFTH CAUSE OF ACTION
### Negligent Misrepresentation and/or Fraud

82. Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows:

83. Defendants are the manufacturers, designers, distributors, sellers or suppliers of Yaz and Ocella and made representations to Defendant and her healthcare providers regarding the character or quality of Yaz and Ocella for guidance in their decision to select Yaz and Ocella.

84. Specifically, Defendants represented that their product was just as safe or safer, and just as effective or more effective, than other birth control products on the market.

85. Defendants' representations regarding the character or quality of Yaz and Ocella were untrue.

86. Defendants had actual knowledge based upon studies, published reports and clinical experience that its products Yaz and Ocella created an unreasonable risk of serious bodily injury and death to consumers, or should have known such information.

87. Defendants negligently and/or intentionally misrepresented or omitted this information in its product labeling, promotions and advertisements and instead labeled, promoted and advertised its product as safer and more effective than other types of oral contraceptives in order to avoid losses and sustain profits in its sales to consumers.

88. In supplying the false information, Defendants failed to exercise reasonable care or competence in obtaining or communicating information to Plaintiff and her healthcare providers.

89. Plaintiff and her healthcare providers reasonably relied to Plaintiff's detriment

upon Defendants' misrepresentations and/or omissions in its labeling, advertisements, and promotions concerning the serious risks posed by the product. Plaintiff reasonably relied upon Defendants' representations to her and/or her healthcare providers that Yaz and Ocella were safer than other types of oral contraceptives for human consumption and/or use and that Defendants' labeling, advertisements and promotions fully described all known risks of the product.

90.     As a direct and proximate result of Defendants' negligent and/or intentional misrepresentations or omissions, Plaintiff suffered personal injuries and economic and non-economic damages, including pain and suffering.

91.     Defendants' actions and omissions as identified in this Complaint demonstrate malicious actions, aggravated or egregious fraud, and/or intentional disregard of Plaintiff's rights so as to warrant the imposition of punitive damages.

## SIXTH CAUSE OF ACTION
### Intentional and Wanton Conduct and Request for Punitive Damages

92.     Plaintiff hereby adopts and incorporates by reference all the above allegations.

93.     At all material times, the Defendants knew or should have known that Yaz and Ocella were inherently dangerous.

94.     Despite their knowledge, the Defendants continued to aggressively market Yaz and Ocella to consumers, including Plaintiff, without disclosing its dangerous side effects Despite Defendants' knowledge of Yaz and Ocella's defective and unreasonably dangerous nature, Defendants continued to test, design, develop, manufacture, label, package, promote, market, sell and distribute, it so as to maximize sales and profits at the expense of the health and safety of the public, including Plaintiff, in conscious disregard of the foreseeable harm caused by Yaz and Ocella.

95.     The Defendants' conduct was intentional and/or wanton.

96. The Defendants' conduct as described above, including, but not limited to, their failure to adequately test their product, to provide adequate warnings, and their continued manufacture, sale, and marketing or their products when they knew or should have known of the serious health risks created, evidences a flagrant disregard of human life as to warrant the imposition of punitive damages as the acts or omissions were committed with knowing, conscious and deliberate disregard for the rights and safety of consumers, including Plaintiff.

### SEVENTH CAUSE OF ACTION
### Breach of Express Warranty as to Bayer Defendants

97. Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

98. The Defendants expressly warranted that Yaz and Ocella were a safe and effective prescription contraceptive. The Yaz and Ocella birth control manufactured and sold by Defendants did not conform to these express representations because it caused serious injury to consumers when taken in recommended dosages.

99. As a direct and proximate result of the Bayer Defendants' breach of warranty, Plaintiff has suffered harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

### EIGHTH CAUSE OF ACTION
### Breach of Implied Warranty as to Bayer Defendants

100. Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

101. At the time the Defendants designed, manufactured, marketed, sold, and distributed Yaz and Ocella for use by Plaintiff, Defendants knew of the use for which Yaz and Ocella were intended and impliedly warranted the product to be of merchantable quality and safe for such use.

102. Plaintiff reasonably relied upon the skill and judgment of the Defendants as to whether Yaz and Ocella were of merchantable quality and safe for its intended use and upon the Defendants' implied warranty as to such matters.

103. Contrary to such implied warranty, Yaz and Ocella were not of merchantable quality for safe for its intended use, because the product was reasonably dangerous as described above.

104. As a direct and proximate result of the Defendants' breach of warranty, Plaintiff has suffered harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

**NINTH CAUSE OF ACTION**
**Violation of the New York Consumer Protection Act**

105. Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

106. At all times relevant, the New York Consumer Protection Act, prohibits the use of any deception, fraud, false pretense, false promise, misrepresentation or concealment, suppression or omission of any material fact in the conduct of any trade or commerce and declares such acts or practices as unlawful.

107. Defendants violated the New York Consumer Protection Act by the use of false and misleading misrepresentations or omissions of material fact in connection with the marketing, promotion, and sale of Yaz and Ocella to Plaintiff.

108. Defendants communicated the purported benefits of Yaz and Ocella while failing to disclose the serious and dangerous side effects related to the use of Yaz and Ocella with the intent that consumers, like Plaintiff, and their healthcare providers rely upon the omissions and misrepresentations and purchase or prescribe Yaz and Ocella, respectively. Plaintiff relied upon

these omissions and misrepresentations.

109.   As a result of violating the New York Consumer Protection Act, Defendants caused Plaintiff to be prescribed and to use Yaz and Ocella, causing severe injuries and damages as previously described herein.

## TENTH CAUSE OF ACTION
### Loss of Consortium

110.   Plaintiffs repeat and reallege all allegations contained in all paragraphs above as if fully set forth herein.

111.   As a direct and proximate result of Defendants' conduct as detailed above, Mr. Robbie was injured and caused to lose the consortium and society of his spouse, Mrs. Robbie.

Wherefore, Plaintiffs demand judgment for damages, including costs, interest as applicable, and a trial by jury.

Plaintiffs, therefore, demand a trial by jury as to every fact and issue presented.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1.   Compensatory and punitive damages in excess of the jurisdictional amount;

2.   Medical expenses and other economic damages in an amount to be determined at trial of this action;

3.   Attorneys' fees, expenses, and costs of this action as allowed by law;

4.   Punitive damages as allowed by law;

5.   Such further relief as this Court deems necessary, just, and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: March 19, 2012

/s/ Edward A. Wallace
Edward A. Wallace
WEXLER WALLACE LLP
55 West Monroe Street, Suite 3300
Chicago, Illinois 60603
312-346-2222
312-346-0022 FAX
eaw@wexlerwallace.com
Attorney for Plaintiff